DEVER, District Judge,
concurring in part and dissenting in part:
I agree with the majority that the district court violated the Confrontation Clause of the Sixth Amendment at trial in accepting the stipulation that the package seized at the Louisville airport contained 98.61 grams of heroin. I respectfully dissent, however, from the majority’s conclusion that the error requires a new trial. Notably, the stipulation did not connect Williams to the seized package or inculpate Williams in the charged conspiracy in any *135 way. Having reviewed the record in light of Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), and the substantive law of conspiracy, I would affirm the conviction. I describe the evidence and the events at trial at somewhat greater length than the majority in order to explain why it is “clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.” Neder, 527 U.S. at 18, 119 S.Ct. 1827. Moreover, because the Confrontation Clause does not apply to the calculation of drug weight at sentencing, I also would affirm the sentence.
I.
The one-count indictment in this case states:
That beginning at a time unknown to the Grand Jury, but beginning at least on or about September 25, 2007, and continuing through October 10, 2007, in the District of South Carolina and elsewhere, the Defendants, RANDOLPH WILLIAMS, a/k/a “Red”; TIMOTHY RAY BYRD, a/k/a Victor Oneill Jackson; and SABRINA T. HUTCHINSON, knowingly and intentionally did combine, conspire and agree together and have tacit understanding with each other and various other persons, both known and unknown to the grand jury, to knowingly, intentionally, and unlawfully possess with intent to distribute a quantity of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);
All in violation of Title 21, United States Code, Section 846.
J.A. 7.
Williams decided to go to trial and to make the United States prove the three elements of the charged conspiracy beyond a reasonable doubt:
(1) an agreement to possess heroin with the intent to distribute existed between two or more persons; (2) [Williams] knew of the conspiracy; and (3) [Williams] knowingly and voluntarily become part of the conspiracy.
See United States v. Reid, 523 F.3d 310, 315 (4th Cir.2008). Williams’s theory of the case was simple: he did not know of the alleged conspiracy or knowingly and voluntarily become part of the alleged conspiracy.
At a pre-trial hearing on the morning of the first day of trial, counsel for the United States and counsel for Williams stipulated that the testimony of the government’s forensic chemist would show that the package seized at the Louisville airport on October 3, 2007, contained 98.61 grams of heroin. J.A. 11, 40-41. Defense counsel agreed to stipulate that the seized package contained 98.61 grams of heroin as a trial strategy because Williams’s theory of the case was that he did not know about the alleged conspiracy and was not part of the alleged conspiracy; therefore, the weight of the heroin “really doesn’t matter.” Id. at 11. Over Williams’s objection, the district court accepted the stipulation. Id. at 11, 40-41.
On September 3, 2008, Williams’s trial commenced. Id. at 17. Agent Eric Murphy, of U.S. Customs and Border Protection, testified first. Id. at 19-26. Murphy explained that he examined packages arriving into the United States from outside the United States and was assigned to the Louisville International Airport in Louisville, Kentucky. See id. at 19-20. On October 3, 2007, Murphy was alerted to a package shipped via United Parcel Service (“UPS”) from Panama, which U.S. Customs views as a high risk country for drug *136 smuggling. Id. at 21-22, 25. The package listed a return address in Windex, Panama and was addressed to Sabrina Hutchinson, 142 Westover Drive, Spartanburg, South Carolina. Id. at 22-23.
Murphy identified the package, and it was received into evidence. Id. at 22; Govt. Ex. No. 1. Murphy testified that on October 3, 2007, he opened the package and found an envelope inside. J.A. 22. Inside the envelope, he discovered a bag containing a substance that field tested positive as heroin. Id. at 23-25. Murphy also testified that drug smugglers commonly used the manner in which the substance was packaged to conceal controlled substances. See id. at 24. The package of heroin itself was admitted as an exhibit, and Murphy showed the package of heroin to the jury. See id.; Govt. Ex. No. 2.
After Murphy seized the heroin, he gave the package (including the package of heroin) to U.S. Immigration and Customs Enforcement (“ICE”) agents in Louisville. J.A. 25-26. The ICE agents in Louisville, in turn, provided the seized package to ICE agents in South Carolina. Id.
Next, Victor Jackson testified. Id. at 27-39. Jackson testified that he had known Williams since he (Jackson) was 13 or 14 years old and that Jackson was now 43. Id. at 28. Jackson and Williams were friends and Jackson would sometimes drive Williams places and do errands for him. Id. Jackson had not been employed for about four or five years, lived with his girlfriend Sabrina Hutchinson at her residence in Spartanburg, and was addicted to crack cocaine. Id. at 29. Jackson also admitted that he had been convicted of distributing crack cocaine. Id.
Jackson admitted that he pleaded guilty to the conspiracy to possess with the intent to distribute a quantity of heroin charged in the indictment. Id. at 29-30. Jackson also admitted that he hoped that the prosecutor would make a motion to reduce his sentence due to his cooperation. Id. at 30.
Jackson then testified about the conspiracy. Jackson explained that Williams and he reached an agreement in the fall of 2007. Id. at 30. Specifically, Williams asked Jackson to receive a package addressed to Sabrina Hutchinson at Hutchinson’s house. Id. Jackson knew that the package contained drugs. Id. at 31-32. Once Jackson received the package, Jackson agreed to call Williams to pick up the package. Id. at 31. In exchange for receiving the package, Williams agreed to pay Jackson $500. Id. Jackson told Hutchinson (who Jackson said was “a little slow”) to be on the lookout for a package and to let Jackson know when it arrived. Id. at 32.
In early October 2007, Williams called Jackson and said that the package had been “intercepted” in Kentucky. Id. About three or four days after that phone call, a UPS van arrived at Hutchinson’s residence. Id. at 33. Jackson was inside, peered out the window, and saw the UPS van. Id. Jackson immediately called Williams and told him what was happening. Id. Williams told Jackson to speak to the UPS driver, but not to sign for anything. Id.
While on the phone with Williams, Jackson opened the door. Id. The UPS driver (who really was Lieutenant Brian Duncan of the Spartanburg County Sheriffs Department) asked if Sabrina Hutchinson lived there, and Jackson said yes. Id. at 34-35. The UPS driver then handed the package to Jackson. Id. at 34. During his direct examination, Jackson identified Government Exhibit No. 1 as the package he received. Id.
After Jackson accepted the package, other officers exited the UPS van and arrested Jackson. Id. Jackson agreed to *137 cooperate and called Williams. Id. at 35-36. Williams, however, did not answer his phone. Id.
On cross examination, Jackson admitted that he was a crack cocaine addict and had sold bootleg copies of CDs and DVDs to Williams. Id. at 37-38.
The prosecutor then read the stipulation to the jury. Id. at 40^11. Before the prosecutor read the stipulation, the court instructed the jury that “a stipulation ... is an agreement between the attorneys for each side which you can accept as having been proven.” Id. at 40. The stipulation stated that the prosecutor and defense counsel stipulate that a qualified, expert forensic chemist had examined the package seized from the UPS sorting facility on October 3, 2007, and the package contained 98.61 grams of heroin, a schedule I controlled substance. Id. at 40-41.
Next, Lieutenant Brian Duncan testified. Id. at 42-46. On October 9, 2007, Special Agent Paul Criswell and ICE notified Duncan that “a package had been found in Kentucky that contained heroin.” Id. at 43. Criswell and ICE asked Duncan to dress up to resemble a UPS driver and to make a controlled delivery to 142 West-over Drive in Spartanburg. Id. Duncan agreed. Thus, on October 10, 2007, Duncan posed as a UPS driver and delivered the package to Jackson. Id. at 42-43.
Duncan testified that when Jackson answered the door, Jackson was talking on the phone. Id. at 44. Duncan handed the package to Jackson. Id. at 43. Criswell and Investigator Matt Hutchins of the Spartanburg County Sheriffs Office then exited the van in which they had been hiding, and arrested Jackson. See id. at 44. Duncan, Hutchins, and Criswell then asked Jackson if he would cooperate. Id. Jackson agreed and tried to call Williams. Id. at 44-45. Williams, however, did not answer. Id. at 45.
Duncan then identified Government Exhibit No. 1 as the package that he delivered to Jackson on October 10, 2007. Id. Duncan also identified Government Exhibit No. 2 as the package of heroin contained inside Government Exhibit No. 1. Id.
On cross examination, Duncan admitted that Williams was not at the residence when Duncan delivered the package containing heroin to Jackson. Id. at 46.
Agent Paul Criswell then testified. Id. at 46-62. Criswell explained that he was an ICE agent assigned to Greenville, South Carolina. Id. at 47. On October 8, 2007, an ICE agent in Louisville, Kentucky contacted him and told him that ICE had intercepted a package of heroin in Louisville destined for Sabrina Hutchinson, 142 Westover Drive, Spartanburg, South Carolina. Id. at 47-48. Criswell then contacted the Spartanburg County Sheriffs Office and Spartanburg City Police Department to assist with a controlled delivery of the package. Id.
Criswell identified Government Exhibit No. 1 as the package that he received from the Louisville ICE office. Id. at 48-49. Criswell also identified Government Exhibit No. 2 as “the heroin that was contained within the package that [he] received from [the] Louisville office.” Id. at 49.
Criswell then explained the role that he played in the controlled delivery, in Jackson’s arrest, and in Hutchins’s interview of Hutchinson and Jackson. Id. Criswell also explained that he presented information from the investigation to the U.S. Attorney’s Office, and a federal grand jury indicted Williams, Jackson, and Hutchinson on January 8, 2008. Id. at 49-50. After the indictment, federal arrest warrants were issued. Id. at 50. On January 9, 2008, Criswell, Hutchins, Duncan, and an ATF agent went to arrest Williams at Williams’s residence. Id.; id. at 2.
*138 Criswell identified Government Exhibit No. 4 as a statement of rights and waiver of rights form (“waiver form”). Id. at 50-51; Govt. Ex. No. 4. Criswell explained that he read the waiver form to Williams on January 9, 2008. J.A. 51-52. Williams appeared to understand his rights, did not appear intoxicated, agreed to waive his rights, and signed the waiver form. Id. at 52-53; Govt. Ex. No. 4. Criswell and Hutchins also signed the waiver form as witnesses. Id.
Criswell did not promise Williams anything or threaten him. J.A. 53. Rather, Williams freely and voluntarily gave the agents a statement regarding his involvement in the heroin shipped from Panama to Hutchinson’s residence. Id. at 53-54.
According to Criswell, Williams said that he contacted Jackson about bringing heroin into the United States. Id. at 54. Williams explained that he had been in contact with a man nicknamed “Cool” in Panama and that Cool sent the package containing the heroin. Id. (Criswell then identified Cool as James Alexander Smith III and explained that authorities had issued a federal arrest warrant in the Eastern District of New York against Smith III. Id. at 55.) Williams also told Criswell that he knew another man nicknamed “Cooehie” a/k/a James Alexander Smith, Jr., that Cooehie had been found guilty of conspiracy to distribute heroin, and that Williams had previously obtained heroin from Cooehie. Id.
Williams then told Criswell that Jackson was supposed to receive a package addressed to Sabrina Hutchinson and delivered to her residence. Id. at 55-56. When the package arrived, Jackson was to call Williams. Id. In exchange, Williams agreed to pay Jackson approximately $500. Id. at 56. Williams also told Criswell that while the package was in transit from Panama, Cool called Williams and said that the package had been held up in Kentucky. Id.
As for Williams’s intent, Williams told Criswell that once he received the package from Jackson, he intended to sell the heroin contained in the package. Id. at 56-57. Williams also explained that Cool had “fronted” him the heroin, which meant that Williams obtained the heroin on credit and would use some of the proceeds of his heroin sales to pay Cool. Id. at 57.
On cross examination, Criswell admitted that Williams had gathered bottles of medication at his residence upon his arrest. Id. at 60. Criswell also admitted that Cooehie is incarcerated within the Bureau of Prisons and that Williams had told Criswell that Cool was in prison in Panama. Id. at 61. Criswell also admitted that he had not interviewed either Cooehie or Cool. Id.
Next, Investigator Matt Hutchins testified. Id. at 62-67. Hutchins identified Government Exhibit No. 4 as the waiver form that was given to Williams. Id. at 63. Hutchins testified that Criswell read the waiver form to Williams and that Hutchins signed the waiver form as a witness. Id. Hutchins explained that Williams appeared to understand his rights, that neither Hutchins nor Criswell threatened him, that Williams signed the waiver form, and that neither Hutchins nor Criswell promised him anything. Id. at 64. Hutchins also testified that Williams was “very well aware of what was going on” during the interview, that his information was “detailed and coherent,” and Williams said that he approached Jackson about receiving a package that would contain heroin. Id. at 64-65.
On cross examination, Hutchins testified that he was present when Williams was arrested and that, before leaving his residence, Williams gathered bottles of medi *139 cation to take to jail. Id. at 65. On redirect examination, Hutchins testified that the officers did not allow Williams to ingest any medication. Id. at 66. Rather, Williams gathered the bottles of medication, placed them in a bag, and gave the bag to the officers. Id. at 66-67. The officers, in turn, gave the bag of medication to intake at the jail and told Williams that, if he needed medication, the jail nurse would have to administer the medication. Id. at 65-67.
Next, Sabrina Hutchinson testified. Id. at 86-91. Hutchinson explained that in October 2007, she was living with her boyfriend Victor Jackson at 142 Westover Drive in Spartanburg. Id. at 86-87. Jackson asked Hutchinson if she would let Jackson know if a package arrived. She agreed to do so. Id. at 87-88. Hutchinson testified that she did not know she was part of receiving heroin and did not know what Jackson was asking her to do. Id. at 89.
Hutchinson testified that she only completed the seventh grade. Id. at 88. Hutchinson also testified that after being indicted in this case, her lawyer got her to “take some tests and get some records.” Id. at 88-89. Later, Hutchinson said that the prosecutor dismissed the conspiracy charge against her. Id. at 89.
On cross examination, Hutchinson admitted that she never talked with Williams about receiving a package. Id. at 90. Rather, Jackson spoke to her about a package and she agreed to tell Jackson when the package arrived. Id. Finally, she testified that she did not know that Jackson used drugs and had never met Williams or spoken to Williams on the phone. Id. at 90-91. She only knew Williams was a friend of Jackson. Id.
The defense presented one witness: the defendant. Id. at 67-83. Williams admitted that he had multiple drug arrests and convictions, including for using heroin. Id. at 68. Williams also admitted knowing Jackson since approximately 1981 and admitted that Jackson sometimes drove him places because Williams did not have a driver’s license. Id. at 68-69. As for his more recent relationship with Jackson, Williams testified that Jackson would sell him bootleg copies of CDs and DVDs. Id. at 69.
Williams then testified about his medical condition. Id. at 70. He explained that in October or November 2007, he had a portion of his colon removed. Id. In early January 2008, he was at home in bed, when officers arrived with an arrest warrant naming Williams, Jackson, and Hutchinson in the charged conspiracy. Id. at 70-72. Before the officers took him to jail, Williams testified that he ingested prescription medicine in front of the officers. Id. at 70-71. Williams also testified that the medicine makes him sleepy. Id. at 72.
Williams then testified about his memory of the events at the jail. Id. at 73. Williams admitted that the officers advised him of his rights and that he signed the waiver form. Id. After signing the waiver form, officers then took him from the jail to the sheriffs department for an interview. Id. at 73-74.
During his interview, Williams told the officers that he knew a man nicknamed “Cool” and that Cool’s real name was Smith. Id. at 75-77. Williams then identified Cool in a photographic line-up. Id. Williams then explained that when he told officers about agreeing to receive a package from Cool, he was talking about a package that he received from Cool ten years earlier. Id. at 77. As for his conversations with Jackson about accepting a package, Williams testified that he only spoke with Jackson about bootleg CDs and *140 DVDs. Id. Finally, Williams testified that he had not used heroin for about ten years, that he had been married for ten years, and that he had been going to church every Sunday. Id. at 78.
On cross examination, Williams testified that he had been addicted to heroin in 2000, but had been clean since 2000 or 2001. Id. at 79-80. As for his January 2008 interview with officers, Williams testified that he confessed to being part of the conspiracy due to threats from the officers. Id. at 80. Williams admitted, however, that he had seen phone records indicating 44 phone calls between Jackson’s phone and his phone during the time period of October 1, 2007, to October 10, 2007. Id. at 81-82. Williams also admitted that he was on the phone with Jackson when the officers made the controlled delivery to Jackson. Id. at 82.
The lawyers then delivered their closing arguments. United States v. Williams, No. 7:08-cr-00025-HMH-1, [D.E. 171], at 3 (D.S.C. Sept. 3, 2008). Each argument was very succinct. The prosecutor argued that the United States had proven beyond a reasonable doubt that Williams and Jackson had conspired to possess with intent to distribute a quantity of heroin. Id. In support, the prosecutor cited the package from Panama containing heroin and cited Williams’s confession and his admission that he was on the phone with Jackson during the controlled delivery of the package of heroin. Id. at 3-4. The prosecutor conceded that Williams was in poor health and a former heroin addict, but urged the jury to not use sympathy to excuse Williams’s behavior. Id. at 4. The prosecutor noted that Williams and Jackson did not mind using Hutchinson to facilitate the conspiracy and also cited the 44 phone calls between Williams and Jackson during the time period of October 1, and October 10, 2007. Id. at 5. The prosecutor then stressed the need to use common sense in evaluating the evidence. Id. The prosecutor rejected Williams’s claim that officers twisted his words during his post-arrest interview, but somehow came up with the names Coochie and Cool. Id. Finally, the prosecutor mentioned the package of heroin, the stipulation that the package contained 98.61 grams of heroin, Jackson’s testimony about how the conspiracy came into being, and Williams’s confession concerning the conspiracy to possess with the intent to distribute a quantity of heroin. Id. at 5-6. The prosecutor then asked the jury to convict Williams. Id. at 6.
In response, defense counsel returned to the defense theme: Williams had no knowledge of the alleged conspiracy and never joined it. In support, defense counsel stated: “The defense has stipulated there’s heroin in that package because it was not heroin that Mr. Williams knew about.” Id. at 6. Defense counsel then reminded the jury that the package was addressed to Sabrina Hutchinson and that Hutchinson testified that she never talked to Williams about accepting a package for him. Id. Rather, Hutchinson said that Jackson asked her to accept a package and that Jackson told Hutchinson that the package belonged to Williams. Id. at 6-7. Defense counsel then questioned Jackson’s credibility in light of his guilty plea to the charged conspiracy and his hope for a sentence reduction. Id. Defense counsel also noted that Jackson and Williams had known each other a long time, but the relationship involved Jackson selling bootleg CDs and DVDs to Williams. Id.
Defense counsel then noted that the government failed to verify who sent the package of heroin from Panama and failed to interview either Coochie or Cool. Id. at 7-8. As for Williams’s confession, defense counsel explained that he felt pressured to *141 tell the officers what they wanted to hear and that his alleged confession actually concerned events of many years before October 2007. Id. Defense counsel then asked the jury to find Williams not guilty. Id. at 8. The jury was then dismissed for the day.
On September 4, 2008, the jury returned and the district court instructed the jury that, to prove that Williams is guilty, “the Government [was required to] prove the following elements beyond a reasonable doubt”: (1) “that an agreement existed between two or more persons to possess with the intent to distribute heroin”; (2) “that the defendant knew of the conspiracy”; and (3) “that the defendant knowingly and voluntarily became a part of the conspiracy.” J.A. 102. The district court gave a variety of other standard instructions on the burden of proof, how to consider the evidence, and the law of conspiracy. See id. at 94-107.
After beginning deliberations, the jury sent a note to the court and asked three questions. First, the jury asked, ‘What amount of drugs does it take to qualify for distribution as opposed to self-use?” Id. at 109. The court then repeated a portion of its original charge:
[W]hile you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.
Id. at 112. It also stated:
Basically, what you are determining is whether the drugs were for personal use of for the purpose of distribution. The possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them. On the other hand, a defendant may have intended to distribute narcotics even if he did not possess large amounts of them. Having said that, the larger the quantity of drugs increases the inference that drugs were possessed with the intent to distribute as opposed to personal use.
Id. at 112-13.
Second, the jury asked, “What is the street value of the drugs?” The court responded: “There was no testimony or evidence to that effect. And we don’t add to the record once you go to the jury room.” Id. at 113.
Finally, the jury asked, “Why were phone records not submitted as evidence and can we see them?” Id. The court instructed the jury that “[t]he records actually were not admitted in evidence and we cannot add to the record. I can tell you that the only record is that the question was asked about the phone records and the defendant agreed.” Id. The court also stated: “I marked as a Court’s Exhibit[.] It should have gone to you anyway[;] you are being sent the stipulation which is part of the record.” Id. The jury then resumed deliberating. Id.
After lunch, the jury sent a note stating: “We need to hear the judge’s charge to the jury again.” Id. at 115. The court then sent a copy of its charge to the jury. Id.
Later, the jury asked: “Can we get a copy of Williams’ testimony? We also would like a copy of [Jackson’s] testimony.” Id. The court instructed the jury at 3:30 p.m. that it could get the testimony transcribed, but “[fit’s going to take a while. You may go back to your jury room.” Id. at 116. The jury continued deliberating. Id. Later, the jury sent another note stating: “We have 11 guilty and *142 one not guilty. We cannot reach [consensus].” Id at 117.
At approximately 5:00 p.m., the court gave an Allen charge. See id. at 118-20. The jury resumed deliberations. Id. at 120-21. At 5:30 p.m. the jury asked: ‘We need to get clarification on considering evidence based on a reasonable doubt and common sense.” Id. at 121. The court then instructed the jury on reasonable doubt and common sense. See id. at 121-22.
The jury later sent another note: “Tomorrow can we review the other officers’ testimony?” Id. at 123. The court instructed the jury that “I will get the court reporter tonight to prepare all of that testimony for you so you can have it to read tomorrow.” Id. at 124.
On September 5, 2008, the jury resumed deliberating at 9:00 a.m. Id. at 126. Shortly after 1:00 p.m., the jury reached a verdict and found defendant guilty. Id. at 126-28.
II.
I agree with the majority that the Fourth Circuit has not decided whether and under what circumstances defense counsel may waive a defendant’s Sixth Amendment right to confrontation. I also agree with the majority that the First, Second, Fifth, Seventh, Ninth, and Tenth Circuits have held in published opinions that defense counsel “may waive his client’s Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney’s decision, and so long as it can be said that the attorney’s decision was a legitimate trial tactic.” United States v. Plitman, 194 F.3d 59, 63-64 (2d Cir.1999) (quotation omitted).[1] The rationale for this waiver rule is that a “well developed body of case law protects defendants from constitutionally defective actions of their attorneys,” Id. at 64; see Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that courts “must accord proper weight to the role of defense counsel in fashioning an overall trial strategy, including one involving waiver of the right to confrontation, for the defendant’s best advantage.” Plitman, 194 F.3d at 64. I also agree that the Sixth Circuit has held that the confrontation right is personal and that defendant must waive it. See Carter v. Sowders, 5 F.3d 975, 981 (6th Cir.1993).[2]
Here, Williams objected to defense counsel’s tactical decision to stipulate to the forensic chemist’s testimony. J.A. 11, 40-41. Nonetheless, the district court accepted the stipulation, thereby allowing defense counsel to waive Williams’s right to confront the forensic chemist. Thus, under the standard of the overwhelming majority of circuits or under the Sixth Circuit standard, the district court violated Williams’s Sixth Amendment right to confront the forensic chemist at trial about her testimony. See, e.g., Melendez-Diaz v. Massachusetts, — U.S. -, 129 S.Ct. 2527, 2531-42, 174 L.Ed.2d 314 (2009); Plitman, 194 F.3d at 63-64.
*143 III.
Of course, a defendant is entitled to a fair trial, not a perfect trial. See, e.g., Van Arsdall, 475 U.S. at 681, 106 S.Ct. 1431; United States v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Moreover, the harmless-error doctrine applies to the Confrontation Clause error that occurred during the trial. See, e.g., Melendez-Diaz, 129 S.Ct. at 2542 n. 14; Van Arsdall, 475 U.S. at 681, 106 S.Ct. 1431; United States v. Banks, 482 F.3d 733, 741-42 (4th Cir.2007); United States v. Khan, 461 F.3d 477, 496 (4th Cir.2006); United States v. Iskander, 407 F.3d 232, 240 (4th Cir.2005). The harmless-error doctrine preserves the “principle that the central purpose of a criminal trial is to decide the factual question of the defendant’s guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.” Arizona v. Fulminante, 499 U.S. 279, 308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quotation omitted). “When reviewing the erroneous admission of [evidence], the appellate court ... simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [evidence] was harmless beyond a reasonable doubt.” Id.-, Sherman v. Smith, 89 F.3d 1134, 1137 (4th Cir.1996) (en banc); see Fed.R.Crim.P. 52(a). In conducting this review, the reviewing court must examine the “whole record.” Neder, 527 U.S. at 16, 119 S.Ct. 1827. The court then must ask: “is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?” Id. at 18, 119 S.Ct. 1827.
In applying the harmless-error doctrine in this case, the Supreme Court’s Van Arsdall decision is instructive. In Van Arsdall, the Court analyzed a Confrontation Clause error and stated:
Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the [erroneously admitted evidence] in the prosecution’s case, whether the [erroneously admitted evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [erroneously admitted evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.
Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.
Here, the erroneously admitted evidence was the stipulation which identified the substance in the package seized at the Louisville airport as heroin and stated that it weighed 98.61 grams. The stipulation did not connect Williams to the seized package or inculpate Williams in the charged conspiracy in any way. Unlike the majority, I do not believe that the stipulation (alone or in combination with the court’s jury instructions) established the first element of the offense. Moreover, I believe an examination of each Van Arsdall factor demonstrates that “a rational jury would have found [Williams] guilty absent the [erroneous admission of the stipulation].” Neder, 527 U.S. at 18, 119 S.Ct. 1827.
First, in determining whether the error was important in the prosecution’s case, one must focus on the elements of the charged crime. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. In order to prove Williams guilty of conspiracy to possess with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), and 846, the government had to prove “that (1) an agreement to possess *144 [heroin] with intent to distribute existed between two or more persons; (2) [Williams] knew of the conspiracy; and (3) [Williams] knowingly and voluntarily became a part of this conspiracy.” Reid, 523 F.3d at 315. The jury did not have to decide upon a specific quantity of heroin. See id.[3]
The stipulation could have impacted only the jury’s finding as to the first element: whether “an agreement to possess [heroin] with the intent to distribute existed between two or more persons.” Id. To prove this element, the government need not prove the actual procurement or even the existence of heroin. See United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008) (“[T]he gravamen of the crime [of conspiracy] is an agreement to effectuate a criminal act.” (quotation omitted)). If Jackson had agreed with Williams to receive a quantity of heroin for distribution, and Williams had requested heroin from Cool, the actual contents of any shipment from Cool would be irrelevant to the existence of the conspiracy. If Cool had actually shipped baking soda instead of heroin, the agreement between Williams and Jackson would be unaffected.[4] Thus, the stipulation was not important or essential to prove the existence of an agreement to possess a quantity of heroin with the intent to distribute. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431; Banks, 482 F.3d at 742 (erroneous admission of unnecessary evidence that violated Confrontation Clause found harmless).
Second, even if the stipulation was important to the prosecutor’s case, the stipulation was cumulative as to the first element of the offense. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. Independent of the stipulation, the jury had before it: (1) Jackson’s testimony concerning his role in the conspiracy; (2) Criswell’s testimony concerning Williams’s confession to participating in the conspiracy; (3) Hutchins’s testimony concerning Williams’s confession to participating in the conspiracy; (4) Williams’s testimony that there were 44 phone calls between his phone and Jackson’s phone from October 1 to October 10, 2007; and, (5) Williams’s corroboration of Jackson’s testimony that he was on the phone with Jackson when the package was delivered. Notably, Williams’s confession included a statement of his intent to distribute and that he had procured the drugs on credit. See United States v. Henley, 360 F.3d 509, 514 (6th Cir.2004) (purchase of drugs by credit arrangement suggests conspiracy with intent to distribute). The promise of $500 to Jackson for the simple act of receiving a package of heroin at Hutchinson’s residence and calling Williams indicates a conspiracy with the intent to distribute. See United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir.1976). The 44 phone calls between Jackson and Williams in a ten-day period (i.e., October 1 to October 10, 2007) indicate a conspiracy. See Yearwood, 518 F.3d at 226. Furthermore, Williams testified that he no *145 longer used heroin, and there was no evidence of personal use by anyone. Thus, independent of the stipulation, there was overwhelming proof of an agreement to possess heroin with an intent to distribute. Simply put, the stipulation was cumulative as to the first element.
Third, the stipulation’s statement that the seized package contained heroin was corroborated by overwhelming and uncontroverted independent evidence. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. Specifically, Murphy testified that the substance was heroin based on a field test. J.A. 23-25. Such “field test” testimony is competent to demonstrate that the substance seized was heroin. See, e.g., Sherman v. Scott, 62 F.3d 136, 142 n. 5 (5th Cir.1995); United States v. Paiva, 892 F.2d 148, 160 (1st Cir.1989); see also Gonzales, 342 Fed.Appx. at 447-48; United States v. Blotcher, 92 F.3d 1182, 1996 WL 442882, at *5-7 (4th Cir.1996) (per curiam) (unpublished table decision). In addition, Murphy testified that, based on his training and experience, the packaging of the substance in the seized package was consistent with how smugglers packaged illegal narcotics. J.A. 24. Murphy’s testimony and the package of heroin were received into evidence without objection, and Murphy then showed the package of heroin to the jury. See id. at 21-25; see also id. at 45, 92; Govt. Ex. No. 2. Duncan also testified that the package of heroin contained in Government Exhibit No. 2 was contained inside Government Exhibit No. 1, explained the controlled delivery to Jackson, and again showed the package of heroin to the jury. Id. at 44-45. Furthermore, Criswell explained his role in the investigation, described Williams’s confession, and again showed the package of heroin to the jury. Id. at 47-49; Govt. Ex. No. 2. Thus, three witnesses showed the package of heroin to the jury and identified the package of heroin as being in the package sent from Panama addressed to Sabrina Hutchinson, seized in Louisville, and delivered to Jackson. Therefore, independent of the stipulation, the evidence overwhelmingly establishes that the substance in the package was heroin.
As for the stipulation’s reference to the heroin weighing 98.61 grams, I agree that there was no other evidence that the heroin weighed precisely 98.61 grams. Cf. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. However, the stipulation was not “the only evidence of the amount of heroin.” Majority Op. at 134. While I acknowledge the difference between “weight” and “amount,” we should focus on whether that precise weight figure would be material to a rational jury. Neder, 527 U.S. at 18-19, 119 S.Ct. 1827; Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. In my view, the precise weight figure would not be material to a rational jury. Rather, the more probative piece of evidence to a rational jury would be the amount of the substance that three witnesses identified as heroin and showed to the jury. After all, jurors do not just hear testimony during a trial. They also see the physical evidence that is introduced, such as the package of heroin introduced as Government Exhibit No. 2 in this case. Here, the package of heroin that the jury repeatedly saw was evidence — independent of the stipulation — both of the amount of heroin and that the amount was intended for distribution. See, e.g., United States v. Triana, 477 F.3d 1189, 1195 (10th Cir.2007); United States v. Wright, 131 F.3d 1111, 1112-16 (4th Cir.1997); United States v. Richards, 638 F.2d 765, 769 (5th Cir.1981); Dolan, 544 F.2d at 1221-22. Moreover, the court instructed the jurors that the amount of heroin was not dispositive to the determination of whether the drugs were intended for distribution. J.A. 112-13. *146 The court also instructed the jurors that they should use their reason and common sense to evaluate the evidence and testimony they had heard. Id. In addition, a rational jury determining intent would focus on the credibility dispute among Jackson (who testified to his role in the conspiracy), the agents (who testified about Williams’s confession), and Williams (who testified that the agents threatened him and misunderstood him during his interview, but who also made key admissions during his trial testimony). A rational jury’s analysis of the credibility dispute would not be impacted by the stipulation because the stipulation did not inculpate Williams and was unrelated to the credibility dispute. See, e.g., Neder, 527 U.S. at 18-19, 119 S.Ct. 1827; Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.
Fourth, the record lacks any evidence contradicting the stipulation. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. Williams’s entire theory of the case was that he did not know about the conspiracy alleged in the indictment among Jackson, Hutchinson, and others “known and unknown to the grand jury,” and that he did not join the conspiracy alleged in the indictment. Therefore, Williams never contended that the package did not contain heroin or “raised evidence sufficient to support a contrary finding.” Neder, 527 U.S. at 19, 119 S.Ct. 1827; Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431; Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); United States v. Abu Ali, 528 F.3d 210, 256-57 (4th Cir. 2008). Further, Williams never contended that the heroin was intended for personal use, as opposed to distribution and therefore “never raised evidence sufficient to support a contrary finding.” Neder, 527 U.S. at 19, 119 S.Ct. 1827. Indeed, Williams testified that he had not used heroin since 2000 or 2001. Williams also did not contend that Jackson or Hutchinson obtained the package of heroin for personal use in that there was no evidence that either Jackson (a crack cocaine addict) or Hutchinson ever used heroin. The only two elements that Williams will contest at his new trial are the same two elements that he contested at his first trial and which had nothing to do with the stipulation: whether he knew of the conspiracy alleged in the indictment and whether he knowingly and voluntarily became a part of the conspiracy. Cf. Neder, 527 U.S. at 19-20, 119 S.Ct. 1827 (finding error harmless where defendant did not dispute omitted element); United States v. Lovern, 293 F.3d 695, 700-01 (4th Cir. 2002) (same).
Fifth, Williams had ample opportunity to cross examine Murphy, Duncan, and Criswell on the facts contained in the stipulation, specifically the identity of the substance in the package and its weight. He never did so. For example, Williams’s attorney chose to forgo cross examination of Murphy, without objection from Williams, despite Murphy’s testimony that the substance field tested positive for heroin and was packaged consistent with drug smuggling. Moreover, the record reflects that had the stipulation been rejected, and had the forensic chemist testified, the cross examination of the chemist would have been identical to that of Murphy — nonexistent.
Finally, the overall strength of the prosecution’s case dictates a finding of harmlessness. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. “[T]he government presented a substantial amount of evidence tending to inculpate [Williams].” Banks, 482 F.3d at 742. The stipulation was, at most, “duplicative of a wealth of other evidence” presented by the prosecution. Khan, 461 F.3d at 496; United States v. Smith, 451 F.3d 209, 222 (4th Cir.2006); United States v. Mackey, 114 F.3d 470, *147 474-75 (4th Cir.1997); United States v. Blevins, 960 F.2d 1252, 1262-63 (4th Cir. 1992). Further, the two elements that Williams contested — whether he knew of the conspiracy alleged in the indictment and whether he knowingly and voluntarily became a part of the conspiracy — had nothing to do with the stipulation. A rational jury would not have considered the stipulation in determining whether the government proved those elements beyond a reasonable doubt.
Each Van Arsdall factor strongly indicates that the error was harmless beyond a reasonable doubt. Having reviewed the whole record under the governing standard, I am convinced that the district court’s error concerning the stipulation was harmless beyond a reasonable doubt. Neder, 527 U.S. at 18-20, 119 S.Ct. 1827; see Lovern, 293 F.3d at 700-01; United States v. Perry, 46 F.3d 1128, 1995 WL 45521, at *4 (4th Cir.1995) (per curiam) (unpublished table decision) (Defendant “failed to present any evidence to cast doubt on the stipulation’s validity.... The stipulation at issue in this case was not an admission of guilt. [Defendant] never questioned that the bank was robbed or whether its deposits were federally insured. The sole issue challenged by the defense was one of identity.”). Thus, I respectfully dissent and would affirm the conviction.
IV.
As for Williams’s sentencing, the statutory maximum term of imprisonment for conspiracy to possess with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 is 240 months. See 21 U.S.C. § 841(b)(1)(C). At Williams’s sentencing hearing, Williams did not object to the drug weight of 98.61 grams or present any evidence to show that such an amount was not properly attributed to him. See J.A. 134-47, 160, 171-73; cf. U.S.S.G. § 2D1.1(c)(8) (2008). In light of Williams’s accountability for 98.61 grams of heroin and U.S.S.G. § 2D1.1(c)(8), the presentence report (“PSR”) provided for a base offense level of 24. See J.A. 165; U.S.S.G. § 2D1.1(c)(8) (2008). Thus, the district court calculated Williams’s advisory guideline range as 63 months to 78 months. After considering the 18 U.S.C. § 3553(a) factors, the district court sentenced Williams to 78 months’ imprisonment. J.A. 148-49.
Williams argues that the district court violated the Confrontation Clause in relying on the stipulated weight of the heroin at sentencing and the error was not harmless. Williams’s argument, however, fails because the Confrontation Clause did not bar the sentencing court from considering the stipulated weight of the heroin. Cf. Fry v. Pliler, 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (“[I]t would not matter which harmless error standard is employed if there were no underlying constitutional error.”). As the Fourth Circuit has explained repeatedly, “because the Sixth Amendment does not apply to the process of calculating an advisory sentence under the [U.S. Sentencing] Guidelines, [any] Sixth Amendment-based evidentiary restrictions do not apply to that process either.” United States v. Dean, 604 F.3d 169, 174 (4th Cir.2010).[5] Thus, the district *148 court did not violate the Confrontation Clause and properly relied on the stipulated drug weight of 98.61 grams in the PSR. See Fed.R.Crim.P. 32(i)(3). Accordingly, there was no error at sentencing, and I also would affirm the sentence.

. See Janosky v. St. Amand, 594 F.3d 39, 47-48 (1st Cir.2010); United States v. Cooper, 243 F.3d 411, 418 (7th Cir.2001); Hawkins v. Hannigan, 185 F.3d 1146, 1154-56 (10th Cir. 1999); United States v. Stephens, 609 F.2d 230, 232-33 (5th Cir. 1980); United States v. Goldstein, 532 F.2d 1305, 1314-15 (9th Cir. 1976); accord United States v. Gonzales, 342 Fed.Appx. 446, 447-48 (11th Cir.2009) (per curiam) (unpublished).

. In dicta, the Eighth Circuit has stated that “the right of confrontation is personal and fundamental and cannot be waived by counsel.” Clemmons v. Delo, 124 F.3d 944, 956 (8th Cir. 1997).

. The district court had the jury make a finding as to a specific drug weight. See J.A. 105-06. In light of the offense charged in the indictment and Reid, there was no need to submit the issue of drug weight to the jury. See, e.g., Reid, 523 F.3d at 310, 314-17; United States v. Cannady, 283 F.3d 641, 647-49 (4th Cir.2002); 21 U.S.C. § 841(b)(1)(C).

. Because the stipulation is not essential to establish the first element and did not increase the penalty for the crime beyond the prescribed statutory maximum, the defendant's right to a trial by jury was not violated. See, e.g., Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Reid, 523 F.3d at 314-17; United States v. Johnson, 71 F.3d 139, 142 (4th Cir.1995); see also United States v. Fuller, 162 F.3d 256, 259-61 (4th Cir.1998). The majority does not reach this question. See Majority Op. at 133 n. 2.

. The principle is so well established that it appears in countless unpublished decisions. See, e.g., United States v. Martinez, 274 Fed.Appx. 291, 293 (4th Cir.2008) (per curiam) (unpublished); United States v. Debreus, 255 Fed.Appx. 725, 727 (4th Cir.2007) (per curiam) (unpublished); United States v. Sullivan, 238 Fed.Appx. 955, 956 (4th Cir.2007) (per curiam) (unpublished); United States v. Levesque, 232 Fed.Appx. 364, 366 (4th Cir. 2007) (per curiam) (unpublished); United States v. LaChance, 223 Fed.Appx. 237, 238 *148 (4th Cir.2007) (per curiam) (unpublished); United States v. Newbold, 215 Fed.Appx. 289, 299 (4th Cir.2007) (per curiam) (unpublished); United States v. Statts, 189 Fed.Appx. 237, 238 (4th Cir.2006) (per curiam) (unpublished); United States v. Cole, 180 Fed.Appx. 435, 438 (4th Cir.2006) (per curiam) (unpublished).